28 C.C.P.A.(Patents)

## BENNETT v. SONNENFELD.

## SONNENFELD v. BENNETT.

### Patent Appeals Nos. 4376, 4377.

Court of Customs and Patent Appeals.

Feb. 24, 1941.

Henry T. Hornidge, of New York City, for Bennett.

George J. Schottler, of New York City (George J. Schottler and Manvel Whittemore, both of New York City, of counsel), for Sonnenfeld.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

These are appeals in an interference proceeding from a decision of the Board of Appeals of the United States Patent Office. Two counts are involved. The Examiner of Interferences in his decision awarded priority of invention of the subject matter of both counts to the party Sonnenfeld. The Board of Appeals reversed the decision of the examiner as to count 1 and awarded priority of invention of the subject matter of that count to the party Bennett and affirmed the decision of the examiner as to count 2.

Bennett appeals from the award of priority to Sonnenfeld as to count 2 (Appeal No. 4376), and Sonnenfeld appeals from the award of priority to Bennett as to count 1 (Appeal No. 4377). The appeals were briefed and argued together and will be decided in this opinion.

The involved invention relates to high tension electric cable systems, and is sufficiently clear from the counts, which read as follows:

"1. A multi-conductor high tension electric cable system comprising in combination a plurality of cable conductors of the solid stranded type, each conductor being individually insulated with oil pervious impregnated insulating material and said conductors being free for relative lateral movement, a pipe line enclosing said conductors, the internal diameter of said pipe line relatively to the space occupied by the conductors and their insulation being such as to permit of said insulated conductors being drawn into the pipe line and to permit of their free movement relatively to each other within the pipe line to accommodate variations in their length incident to operation, oil filling the space in said pipe line unoccupied by the said insulated conductors, said insulated conductors being immersed in and in direct contact with said oil, and means for maintaining said oil under a pressure of not substantially less than five atmospheres to increase its dielectric strength and promote impregnation of the cable and the elimination of internal corona losses.

"2. A high tension electric cable system comprising in combination an unsheathed cable conductor insulated with permeable impregnated insulating material, a pipe line enclosing said conductor, the internal diameter of said pipe line relatively to the space occupied by the conductor and its

insulation being such as to permit of said insulated conductor being drawn into the pipe line and to permit of its free movement transversely within the pipe line, oil filling the space in said pipe line unoccupied by the said conductor and its insulation and in which the conductor and its insulation are submerged, and means for maintaining said oil under sufficiently high pressure to increase its dielectric strength."

■ The interference arises between the application of the party Bennett, Serial No. 666,032, filed April 13, 1933 (a division of an application, Serial No. 553,714, filed July 29, 1931, which ripened into patent No. 2,015,063 issued September 24, 1935), and the application of the party Sonnenfeld filed December 10, 1931, based upon his Austrian application No. A 9267-30, filed December 10, 1930. Bennett is therefore the junior party and must prove priority of the involved invention by a preponderance of the evidence.

Count 1 originated in the application of Bennett and count 2 in the application of Sonnenfeld. The interference containing count 1 only was declared October 30, 1936 and was redeclared in its present form May 6, 1937.

The General Cable Corporation is the assignee of Sonnenfeld and the Okonite-Callendar Cable Company, Incorporated, is the assignee of Bennett.

Bennett, in his preliminary statements, alleged conception of the invention between October 1 and October 15, 1930, first drawing, written description and disclosure of the invention to others about October 15, 1930, constructive reduction to practice of the invention by filing an application for patent, serial No. 553,714, July 29, 1931, and diligence in adapting and perfecting the invention from about December 1930. Sonnenfeld, in his preliminary statements, relies upon his Austrian filing date of December 10, 1930.

During the course of proceedings in the Patent Office many motions and petitions were filed. None of them, however, is pertinent to the issue here except the motion of Bennett to dissolve the interference on the ground that the disclosure of the Sonnenfeld application is inadequate to support count 1, and the contention of Sonnenfeld that Bennett is estopped to raise the question of the sufficiency of the application of Sonnenfeld because of his alleged failure to raise the same question in a former interference which involved the present applications and the application of a third party.

In the former interference, under rule 109 of the Rules of Practice in the United States Patent Office, Sonnenfeld proposed four claims, as counts, one of which reads as follows:

"A multi-conductor high tension electric cable system, comprising in combination a plurality of unsheathed cable conductors, each conductor being independently insulated with permeable impregnated insulating material, a pipe line enclosing said conductors, the internal diameter of said pipe line relatively to the space occupied by the conductors and their insulation being such as to permit of said insulated conductors being drawn into the pipe line and to permit of their free movement relatively to each other within the pipe line, oil filling the space in said pipe line unoccupied by the said conductors and their insulation and in which the conductors and their insulation are submerged, and means for maintaining said oil under sufficiently high pressure to increase its dielectric strength."

In the present interference the Primary Examiner stated that while Bennett opposed the introduction of the above-quoted claim on certain grounds he did not raise the question as to whether Sonnenfeld was entitled to make the claim. The examiner held that the present count 1 and the above-quoted claim are precisely the same as to subject matter and so nearly identical in scope that it would be impossible to hold that Sonnenfeld could make one of them but not the other. Although he stated that because of the similarity between the quoted claim and count 1 herein Bennett was probably estopped to question Sonnenfeld's right to make count 1, nevertheless he considered the question on its merits and held that Sonnenfeld's application disclosed every element of the count.

Bennett petitioned the Commissioner of Patents to review the decision of the Primary Examiner. The commissioner held that because the examiner had considered the motion of Bennett on its merits and no manifest error appeared therein it was unnecessary to review the examiner's holding.

The Examiner of Interferences, while he stated that he was precluded by the specific provisions of rule 130 of the Rules of Practice in the Patent Office from reinvestigating the right of Sonnenfeld to make count

1, decided the case upon the question of priority, saying, "it is deemed more desirable to dispose of the issue presented on this ground rather than resort to the somewhat doubtful and technical issues of patentability and right to make herein raised."

Both parties took testimony and the Examiner of Interferences held that Bennett had not proved conception prior to the record date, December 10; 1930, of Sonnenfeld, and that even should Bennett be held to have established prior conception, his activities during the critical period did not constitute reasonable diligence. Accordingly, the Examiner of Interferences awarded priority of invention of the subject matter of both counts to Sonnenfeld.

Upon appeal, the Board of Appeals held that Bennett was not estopped from raising the question of Sonnenfeld's right to make count 1, and that Sonnenfeld's application did not read upon that count. The board, therefore, awarded priority of invention as to count 1 to Bennett. The decision of the Examiner of Interferences awarding to Sonnenfeld priority of invention of the subject matter of count 2 was affirmed by the board.

The issues here are:

"1. Is Bennett estopped to question Sonnenfeld's right to make count 1?

"2. If Bennett is not estopped, does the Sonnenfeld application read upon count 1?

"3. If Sonnenfeld's application does read upon count 1, does the record disclose that Bennett proved conception of the invention prior to Sonnenfeld's filing date and reasonable diligence on Bennett's part during the critical period?"

We will first consider the question of estoppel. The board, in discussing count 1, pointed out that the count contains, among others, limitations specifying that the conductors are free for relative lateral movement and that the oil is under a pressure of not substantially less than five atmospheres. The board then stated: "On the question of estoppel, the two limitations which we have above discussed are not to be found in the claim which is under consideration in the earlier brief. We cannot agree with the Primary Examiner, therefore, that present count 1 and that claim [quoted above] are precisely the same as to subject matter and so nearly identical in scope that it would be impossible to hold

that Sonnenfeld could make one of them but not the other."

We are of opinion that the limitations mentioned by the board are express limitations and cannot be disregarded. They are not found in the above-quoted claim. Therefore, in our opinion the conclusion of the Board of Appeals that Bennett is not estopped from questioning the disclosure of the Sonnenfeld application as to count 1 was proper.

Since Bennett is not estopped, we must next determine whether Sonnenfeld is entitled to make count 1. Sonnenfeld's right to make count 2 is not questioned. Count 1 differs from count 2 in that count 1 covers: (1) a "multiconductor" system including a "plurality" of conductors, (2) of the "solid stranded type," which are (3) "free for relative lateral movement" or so arranged as to permit "free movement relative to each other," and (4) oil under a pressure "not substantially less than five atmospheres."

It is obvious that Sonnenfeld discloses a multi-conductor system including a plurality of conductors, inasmuch as he states in his application "The present invention consists in insulated conductors * * *", and further that " * * * the invention can rather be extended very successfully for multi-conductor cables."

There is no question but that the conductors disclosed in the Sonnenfeld application are of the solid stranded type.

As to the conductors being free for relative lateral movement or so arranged as to permit free movement relative to each other, Bennett contends that Sonnenfeld's statement that "it will be valuable to strand the insulated conductors and to apply the said protective spiral around the strand" precludes freedom for lateral movement relative to each other. The portion of Sonnenfeld's specification in which the said statement appears reads as follows: "In Fig. 1 and 2 as an example single conductor cables are shown but without confining the invention to them; the invention can rather be extended very successfully for multiconductor cables. In such cases it will be valuable to strand the insulated conductors and to apply the said protective spiral around the strand."

This statement does not negative the drawing into the pipe of several cables without stranding. Rather, it suggests, as optional, a means for protecting the con-

ductors from being damaged by scraping against the end of the pipe. That it is merely suggested as a protective measure is indicated by the following, which also appears in the Sonnenfeld application: "To prevent damage of the insulated core * * * when pulling it into the pipe system it is to be recommended to protect the cable either with a ribbon wrapped on in close or open lay, or with wire * * * so that it will not be chafed when pulled into the pipe * * *."

Furthermore, where, as in count 2, a pipe of wide diameter is shown in which the single conductor is permitted free transverse movement, and there is, as here, a statement without limitation in the application that the invention can extend to the use of multi-conductor cables, the disclosure is sufficient to indicate to those skilled in the art that when several conductors are drawn into a pipe of sufficiently large diameter they must necessarily be free for lateral movement, or free for movement relatively to each other. Therefore, we cannot agree with Bennett's contention.

As to the pressure limitation, Bennett contends that Sonnenfeld's application does not disclose the use of a pressure "not substantially less than five atmospheres." However, we believe that a reading of Sonnenfeld's disclosure, keeping in mind what was known in the art at that time, as it appears to be shown by the testimony of Bennett, indicates that Sonnenfeld contemplated at least 75 pounds pressure, or five atmospheres. Sonnenfeld's application reads, in part: "By using pipe systems which are able to bear very high mechanical pressures, for example Mannesmann steel pipes, pressure can be applied which is considerably higher than pressures used hitherto in connection with oil filled lead sheathed cables." According to Bennett's own testimony, he knew, when he first began studying the problem, that the maximum pressure which could be applied in the then known oil filled lead sheath cable systems was in the neighborhood of 75 pounds (five atmospheres). He testified that the lead sheath would withstand no more than that, and, accordingly, he substituted in his mind the idea of using steel pipe. In view of this testimony, it is clear to us that when Sonnenfeld stated that with the use of steel pipe "pressure can be applied which is considerably higher than pressures used hitherto" he must have

contemplated the use of at least five atmospheres pressure. Sonnenfeld also stated that this application of a higher pressure than theretofore possible would make negligible "the differences in pressure arising in consequence of inequalities of topographical elevation," but this does not affect the disclosure of at least 75 pounds pressure.

For the reasons stated herein we are convinced that the Board of Appeals erred in holding that the Sonnenfeld application failed to disclose the said limitations in count 1.

With respect to the third issue, it is to be noted that Bennett does not claim an actual reduction to practice of the invention prior to his filing date of July 29, 1931. Therefore, in order to prevail it was incumbent upon him to prove conception of the involved invention prior to the filing date of Sonnenfeld—December 10, 1930—and reasonable diligence in reducing said invention to practice from a date immediately prior to Sonnenfeld's filing date to the date of filing the Bennett application.

The record on behalf of Bennett is quite voluminous, consisting of the testimony of Bennett himself and that of ten witnesses, all of whom, with the exception of three, were employees of the Okonite-Callendar Cable Company, Incorporated. The testimony on behalf of Sonnenfeld was given by one witness, an experienced electrical engineer in the employ of the General Cable Corporation, which testimony was for the purpose of contradicting some of the testimony offered on behalf of Bennett with respect to Bennett's tests.

The Examiner of Interferences analyzed the testimony at great length, but in view of our conclusion we do not deem it necessary to dwell in detail upon any part of the record. The record shows that Bennett, an experienced electrical engineer and, at the time of taking of the testimony, manager of the Oilostatic Division of the Okonite-Callendar Company, began his employment with the said company about the middle of October 1930. Shortly thereafter, while working on his first assignment which concerned oil pressure with relation to sheathed high tension electrical cables, he conceived the theory of a different kind of pressure system in connection with such cables. The record shows that he discussed his ideas with several fellow employees and also with friends of his who

were generally familiar with the art. Owing to alleged opposition from his superiors, the testimony shows, he built an apparatus for the purpose of convincing those who opposed him of the soundness of his theory. The vital portion of this apparatus consisted of a glass tube through which ran a nichrome wire connected at sealed ends of the tube with a source of electric current. The tube was filled with oil. When the electric current was applied the wire became heated, in turn heating the oil so that bubbles formed therein. Thereafter, upon the application of pressure to the oil the bubbles disappeared. This apparatus was tested over quite an extended period of time, but it will be noted that there is nothing in this apparatus which remotely resembles the cable systems defined in the counts. The test of the apparatus is not claimed by Bennett to be a reduction to practice, or an attempt to reduce to practice. According to the record, this was merely the means by which he sought to convert to his way of thinking the other experts of the Okonite-Callendar Company, and it is stated that in this he was successful.

Some time subsequent thereto, after considerable delay, due, unquestionably, to the rather slow methods that apparently existed in the corporation with respect to proceeding with new matters, Bennett was authorized to build an experimental cable which was to embody his alleged invention. Accordingly, a cable was built which consisted of a solid stranded conductor surrounded by an insulation of oil impregnated paper, all of which was sheathed in a closely fitting lead envelope or pipe which was apparently extruded upon the insulation. The said lead sheath was fluted longitudinally on the inside and the flutings were filled with oil kept at a high pressure. The lead sheathing was reinforced with steel tape. When tested this cable proved to be a failure. Copper tape was then substituted for the steel tape, and the cable apparently worked. The successful experiment with the fluted lead sheath cable, however, was subsequent to the filing date of Bennett's application.

It is contended by Bennett that the work which he did on the fluted lead sheath cable constituted reasonable diligence in adapting and perfecting the invention defined by the counts. The Examiner of Interferences held that "work on the fluted lead sheath cable not only did not result in a reduction to practice before Bennett filed, but on the other hand constituted activity, as is clear from the testimony as to the nature of the 'fluted lead sheath cable device,' on a distinct species of the invention." He further stated that "Under these circumstances the authorities seem to be uniform in holding that this type of activity does not amount to diligence with respect to the species forming the subject matter in issue," and cited Taylor v. Gilman, 158 O.G. 883, 1910 C.D. 167; Clement v. Richards v. Meissner, 113 O.G. 1143, 1905 C.D. 492; and Campbell v. Jackson, 328 O.G. 781, 1924 C.D. 101.

The Board of Appeals agreed with the Examiner of Interferences on this question of diligence, and we are in accord with the lower tribunals in this respect. See Riemenschneider v. Matthaei, 103 F.2d 366, 26 C.C.P.A., Patents, 1213. It is not necessary, therefore, for us to discuss the vigorously contested matter of the sufficiency of the evidence to establish conception of the invention.

The party Bennett insists, however, that every element of the counts is contained in the fluted lead sheathed system, except the one as to the size of the pipe, and that the vital element of the invention was the effect of external oil pressure on the insulation and the increase in the dielectric strength thereof. Generally speaking the latter statement may be true, but we fail to see how it can be successfully contended that his work on the fluted lead sheath system can constitute diligence in adapting and perfecting the invention as defined by the counts. The counts contain definite limitations to the effect that the diameter of the pipe be large enough to permit the conductor or conductors to be drawn into the pipe line so as to permit the free lateral or transverse movement of the conductor or conductors within the pipe, and that the space in the pipe line unoccupied by the conductor or conductors be filled with oil. It cannot be said from an examination of the exhibit before us representing the fluted lead sheath system that the conductor may be drawn into the pipe line, and certainly there is nothing in the exhibit which could possibly permit free movement of the conductor transversely within the pipe. Moreover, much of the space inside the fluted lead sheath cannot be occupied by oil for the reason that the protuberances between the flutings appear to fit closely upon the insulation.

Bennett was no novice in the patent field. The record shows that he had taken out approximately twenty-five patents, some of which had been involved in interferences in the Patent Office. It is to be presumed, therefore, that he must have known the importance of protecting patentable conceptions by promptly filing applications therefor, and his contention that he was new with the Okonite-Callendar Company and had met with opposition which precluded him from working more rapidly on his invention cannot be considered as persuasive. It would have been a simple matter for him to have filed his application for patent for the invention in issue prior to the time that Sonnenfeld entered the field, or to have been diligently engaged in the preparation of such application before such date. See Schweyer v. Thomas, 68 F.2d 953, 21 C.C.P.A., Patents, 859.

Since we are convinced, as were the tribunals below, that Bennett failed in proving diligence from just prior to December 10, 1930 to his filing date, July 29, 1931, priority of invention of the subject matter of both counts should have been awarded to the party Sonnenfeld.

The decision of the Board of Appeals is affirmed as to Appeal No. 4376 and reversed as to Appeal No. 4377.